IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Salvation Army,                   :
                Appellant       :
                                  :
          v.                     :
                                  :
Wayne County Commissioners,     :
Sitting as Wayne County Board of   :
the Assessment and Revision of     :   No. 730 C.D. 2025
Taxes                           :   Submitted: June 16, 2026

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION
BY JUDGE FIZZANO CANNON           FILED: July 28, 2026


The Salvation Army appeals from a May 9, 2025 order of the Court of Common Pleas of Wayne County (trial court) affirming the decisions of the Wayne County Board of the Assessment and Revision of Taxes (Board). The Board denied The Salvation Army's request for a real estate tax exemption for several tax parcels in Wayne County. Upon review, we conclude that the trial court erred in its application of the requisite legal analysis. Accordingly, we reverse.


## I. Background

The Salvation Army owns a number of contiguous tax parcels in Wayne County comprising the Camp Ladore Retreat and Conference facility, consisting of Lake Ladore and the surrounding land, totaling some 1,200 acres, together with improvements that include, *inter alia*, a lodge, amphitheaters, and nature trails. The Salvation Army Br. at 4; Bd. Br. at 1-2; *The Salvation Army v. Wayne Cnty.*

*Comm'rs, sitting as the Wayne Cnty. Bd. for the Assessment & Revision of Taxes* (C.P. Nos. 196-CIVIL-1992 & 563-CIVIL-1992, filed Apr. 6, 1993) (*Salvation Army I*) (attached as Exhibit B to The Salvation Army's brief). In previous litigation, the trial court issued an opinion and order exempting parts of the property from real estate tax, specifically all of Lake Ladore, all of Ladore Lodge, and the outdoor amphitheaters. *See Salvation Army I* at 10-12. In reaching its conclusion, the trial court first determined that ***The Salvation Army qualifies as an institution of purely public charity*** under the applicable criteria established by the Pennsylvania Supreme Court in *Hospital Utilization Project v. Commonwealth of Pennsylvania*, 487 A.2d 1306 (Pa. 1985) (*HUP*).[1] *Salvation Army I* at 10 (citing *HUP*). Relevant here, the trial court found that The Salvation Army's activities "***relieve[] the government of some of its burdens in a variety of ways.***" *Id.* at 9 (emphasis added).

Notably, in *Salvation Army I*, the trial court did not require The Salvation Army to demonstrate that it met the *HUP* criteria regarding each separate tax parcel. Instead, the trial court focused on the nature of The Salvation Army's overall activities. The trial court applied the then-current statutory provision, the statutory qualifications contained in Section 202 of the former Fourth to Eighth Class County[2] Assessment Law, Act of May 21, 1943, P.L. 571, *as amended*, 72 P.S.

---

[1] Under an *HUP* analysis, an entity meets the constitutional requirements for an institution of purely public charity "if it: 1. Advances a charitable purpose; 2. Donates or renders gratuitously a substantial portion of its services; 3. Benefits a substantial and indefinite class of persons who are legitimate subjects of charity; 4. ***Relieves the government of some of its burden***; and 5. Operates entirely free from profit motive." *Alliance Home of Carlisle v. Bd. of Assessment Appeals*, 919 A.2d 206, 211 (Pa. 2007) (emphasis added) (citing *HUP*).

[2] Wayne County is a county of the sixth class. *See* ADMIN. OFF. OF PA. CTS., https://www.pacourts.us/news-and-statistics/research-and-statistics/dashboard-table-of-contents/resources/WebHelp/General_Information/County_Classes.htm (last visited July 27, 2026).

§ 5453.202.[3]  Applying that statute, the trial court concluded that "all real property which is actually and regularly used for the purposes of [The Salvation Army] is entitled to exemption." *Salvation Army I* at 10.  However, the trial court found that The Salvation Army failed to offer evidence of what uses it made of some of the property, including, for example, the nature trails.  *See id.* at 11.  Therefore, the trial court declined to grant real estate tax exemptions for the tax parcels as to which no evidence of use had been offered.  *See id.*

In 1997, the legislature enacted the Institutions of Purely Public Charity Act (Act 55)[4] "and thereby weighed in on questions affecting determinations of charitable exemption which had, to that point, been left to the realm of the judiciary." *Alliance Home of Carlisle v. Bd. of Assessment Appeals*, 919 A.2d 206, 216 (Pa. 2007).  Section 5 of Act 55 sets forth the criteria for designation as an institution of purely public charity, providing, in pertinent part:

---

[3] Repealed by the Act of Oct. 27, 2010, P.L. 895, No. 93, § 6(1)(ii), effective Jan. 1, 2011. Section 202(a)(3) of the former Fourth to Eighth Class County Assessment Law provided real estate tax exemption for property owned by

> institutions of . . . benevolence or charity, . . . with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity:  Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose:  Provided further, ***That the property of associations and institutions of benevolence or charity be necessary to and actually used for the principal purposes of the institution*** . . . .

72 P.S. § 5453.202(a)(3) (emphasis added); *see also Lock Haven Univ. Found. v. Clinton Cnty. Bd. of Assessment Appeals*, 920 A.2d 207, 213-14 (Pa. Cmwlth. 2007) (quoting *former* Section 202(a)(3)).

[4] Act of November 26, 1997, P.L. 508, *as amended*, 10 P.S. §§ 371-385.

(a) . . . An institution of purely public charity is an institution which meets the criteria set forth in subsections (b), (c), (d), (e) and (f). . . .

(b) . . . The institution must advance a charitable purpose. . . .

(c) . . . The institution must operate entirely free from private profit motive. . . .

(d) . . . (1) The institution must donate or render gratuitously a substantial portion of its services. . . .

(e) . . . (1) The institution must benefit a substantial and indefinite class of persons who are legitimate subjects of charity. . . .

(f) . . . The institution must relieve the government of some of its burden. This criterion is satisfied if the institution meets any one of the following:

(1) Provides a service to the public that the government would otherwise be obliged to fund or to provide directly or indirectly or to assure that a similar institution exists to provide the service.

(2) Provides services in furtherance of its charitable purpose which are either the responsibility of the government by law or which historically have been assumed or offered or funded by the government.

(3) Receives on a regular basis payments for services rendered under a government program if the payments are less than the full costs incurred by the institution, as determined by generally accepted accounting principles.

(4) Provides a service to the public which directly or indirectly reduces dependence on government programs or relieves or lessens the burden borne by government for the advancement of social, moral, educational or physical objectives.

(5) Advances or promotes religion and is owned and operated by a corporation or other entity as a religious ministry and otherwise satisfies the criteria set forth in section 5 [ of Act 55, 10 P.S. § 375].

. . .

(h) . . . (1) Nothing in this act shall affect, impair or hinder the responsibilities or prerogatives of the political subdivision responsible for maintaining real property assessment rolls to make a determination ***whether a parcel of property or a portion of a parcel of property is being used to advance the charitable purpose of an institution of purely public charity or to assess the parcel or part of the parcel of property as taxable based on the use of the parcel or part of the parcel for purposes other than the charitable purpose*** of that institution.

(2) Nothing in this act shall prohibit a political subdivision from filing challenges or making determinations as to ***whether a particular parcel of property is being used to advance the charitable purpose*** of an institution of purely public charity.

10 P.S. § 375[5] (emphasis added).

Here, the Board does not dispute that the trial court concluded in *Salvation Army I* that The Salvation Army, as an organization, qualifies as an institution of purely public charity under the *HUP* criteria. Moreover, the Board stipulates that The Salvation Army meets all but one of the *HUP* factors regarding the separate tax parcels at issue, to wit: The Salvation Army advances a charitable purpose, donates or renders gratuitously a substantial portion of its services, benefits a substantial and indefinite class of persons who are legitimate subjects of charity, and operates entirely free from private profit motive. Bd. Br. at 2. However, the Board asserts that in the current litigation, The Salvation Army failed to meet its

---

[5] Act 55's requirements for status as an institution of purely public charity largely parallel the judicially created factors set forth in *HUP*.

5

burden to demonstrate that it relieves some of the government's burden "as to a portion of the property comprising Camp Ladore." *Id.*

## II. Issues on Appeal[6]

Before this Court, The Salvation Army argues that the trial court erred by failing to hold that The Salvation Army qualifies as an institution of purely public charity under applicable law. The Salvation Army points specifically to the trial court's opinion in *Salvation Army I*, which expressly concluded that The Salvation Army is an institution of purely public charity. The Salvation Army asserts that the trial court misapplied the *HUP*/Act 55 criteria by applying them to separate tax parcels and by "failing to hold that the entirety of the Ladore Property is necessary to and actually used for the principal purposes of [The Salvation Army] and therefore qualifies for a property tax exemption . . . ." Salvation Army Br. at 27.

The Board counters that The Salvation Army's status as an institution of purely public charity does not automatically make all of its properties tax exempt and that The Salvation Army failed to establish that all of the tax parcels at issue relieve the government of some burden, which the Board insists must be shown separately for each tax parcel within the Lake Ladore Retreat and Conference property.

---

[6] "Because the issues involve the proper interpretation of constitutional and statutory provisions, they pose questions of law. As such, this Court's scope of review is plenary and our standard of review is *de novo*." *Alliance Home*, 919 A.2d at 214 (citing *Stilp v. Commonwealth*, 905 A.2d 918, 930 (Pa. 2006)).

### III. Discussion

The fundamental point on which the parties disagree is whether a tax exemption for property owned by an institution of purely public charity rests on the organization's general status or whether the organization must establish that status separately for each tax parcel to be exempted. The Board insists, as the trial court found, that no exemption applies to the tax parcels at issue here because there was no evidence that the use of those tracts relieves the government of some of its burden. Thus, the Board posits that The Salvation Army failed to satisfy all of the requisite *HUP*/Act 55 factors for a tax exemption as an institution of purely public charity with respect to the specific tax parcels at issue. The Salvation Army counters that, because it is undisputedly an institution of purely public charity, and because it uses its Lake Ladore property as a whole in furtherance of its charitable purposes, it need not demonstrate separately that each tax parcel within the Camp Ladore Retreat and Conference property meets each of the criteria for an institution of purely public charity under the *HUP*/Act 55 criteria. Rather, a tax exemption requires only that the property at issue "is actually and regularly used for the purposes of the institution." PA. CONST. art. VIII § 2(a)(v); *see also* Salvation Army Br. at 27 (quoting PA. CONST., art. VIII § 2(a)(v)). We agree with The Salvation Army that it need not meet the *HUP*/Act 55 criteria for each tax parcel.

The analytical framework applicable to this case is directly controlled by the Pennsylvania Supreme Court's decision in *Alliance Home*. There, the organization owning the property at issue was a nonprofit entity that qualified as an institution of purely public charity and maintained several facilities on its property. *See Alliance Home*, 919 A.2d at 208. There, the local board of assessment argued that part of the organization's property, specifically, one of its residence facilities,

did not separately qualify as an institution of purely public charity because the facility charged rents and did not render gratuitous services to its residents. *Id.* In 1997, the board of assessment denied the organization a real estate tax exemption for that facility. *Id.* After the enactment of Act 55, the organization again sought a tax exemption for the facility, arguing that the organization, "as an entire entity, satisfied both the constitutional and statutory requirements for tax exemption . . . ." *Id.* The taxing entity again denied the exemption, "concluding that the issue was controlled by the *res judicata* effect of its 1997 decision." *Id.*

On review, the common pleas court agreed with the taxing entity. The common pleas court posited that the organization's status as an institution of purely public charity had to be determined under article VIII, section 2(a)(v) of the Pennsylvania Constitution[7] by analyzing and applying the *HUP* factors for making such a determination. *Alliance Home*, 919 A.2d at 210. Instead of deciding that issue, however, the common pleas court "focused on the independent living [facility] in isolation from the rest of the organization. The court concluded that [the organization] had not proven by credible evidence, under any standard[,] that it donated or rendered gratuitously a substantial portion of its services to the [facility] residents." *Id.* (additional quotation marks omitted). Thus, like the trial court here, the common pleas court in *Alliance Home* found that the organization had failed to establish one of the *HUP*/Act 55 factors for status of the specific facility as an institution of purely public charity. *See id.*

---

[7] The cited subsection provides, in pertinent part: "The General Assembly may by law exempt from taxation: . . . Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution." PA. CONST. art. VIII § 2(a)(v).

8

This Court affirmed on appeal. In *Alliance Home*, as here, the organization's status as an institution of purely public charity was conceded. *Alliance Home*, 919 A.2d at 211. Recognizing that we did not need to determine such status, this Court viewed the issue before it as whether the separate facility at issue was being used for charitable purposes. *Id.* Determining that it was not, this Court concluded that the land on which the facility was located was not tax exempt. *Id.* at 212.

After granting *allocatur*, our Supreme Court reversed, rejecting the separate parcel analysis framework applied by both the common pleas court and this Court. Instead, the Supreme Court explained:

> Both the trial court and the Commonwealth Court majority determined, in essence, that a parcel of land that is owned by an institution of purely public charity is eligible for exemption only if the parcel, in and of itself, independently satisfies the *HUP*/Act 55 test for determining which entities are purely public charities. This analysis cannot be squared with the constitutional language or the parcel review language in Act 55, which tracks the constitutional standard. Article VIII, Section 2(a)(v) [of the Pennsylvania Constitution] invites and, indeed, requires parcel review. That provision makes clear that the General Assembly may exempt institutions of purely public charity from taxes, but in the case of real property taxes, the institution's exemption only extends to "that portion of real property of such institution which is actually and regularly used for the purposes of the institution." ***The constitutional test respecting parcel review, then, is not the HUP/Act 55 test, which is designed to identify qualifying institutions, but a test focusing on the actual and regular use that the qualifying institution makes of its property and the relationship of that use to the institution's purposes***.

*Alliance Home*, 919 A.2d at 224 (emphasis added).

9

Stated otherwise, the Supreme Court in *Alliance Home* recognized that a taxing entity is entitled to challenge the tax exempt status of an individual tax parcel that is part of a larger overall property. *Alliance Home*, 919 A.2d at 224. However, to demonstrate tax exempt status, the institution seeking a tax exemption need not meet each element of the *HUP*/Act 55 test as to the individual tax parcel, but need only show that the tax parcel is used for the institution's charitable purposes. *Id.* Our Supreme Court concluded that neither the Pennsylvania Constitution nor Act 55 authorized the kind of separate parcel tax exemption analysis that would apply the *HUP*/Act 55 factors to individual tax parcels.[8] Rather,

> Act [55] defines, where Article VIII, Section 2(a)(v) [of the Pennsylvania Constitution] does not, the term "institution," as follows: "[a] domestic or foreign nonprofit corporation, association or trust or similar entity." 10 P.S. § 373. The definition is significant, as the dissenting opinions in the Commonwealth Court[9] recognized, because it makes clear that, in conducting statutory parcel review, ***the individual parcels owned by a single qualifying institution of purely public charity are not to be evaluated as if the parcels represented separate institutions or corporate entities subject to the full-blown HUP/Act 55 test.*** *See Chartiers Valley Sch. Dist. [v. Bd. of Prop. Assessment, Appeals, Rev. and Registry]*, 794 A.2d [981,] 984 [(Pa. Cmwlth. 2002)] ("Act 55 defines the

---

[8] The Supreme Court observed:

> Although the language employed in the statute is not identical to the constitutional text—*i.e.*, where the constitutional text speaks of "used for the purposes of the institution," the statute speaks of "being used to advance the charitable purpose"—it would appear that any definitional difference is minor and, if anything, would serve to narrow the exemption, which the General Assembly is free to do.

*Alliance Home*, 919 A.2d at 224.

[9] Judges Leavitt and Simpson filed separate dissenting opinions in *Alliance Home*.

10

> basic unit of evaluation as a corporation, association or trust or other similar entity. The basic unit of evaluation may not be aggregated. . . . Similarly, **the basic unit may not be divided**. . . .").

*Id.* at 224-25 (emphasis added). Instead, "[t]he dispositive question . . . is whether the parcel or portion of land comprising [the] facility [at issue] is actually and regularly used for the purposes of the institution or to advance the charitable purpose of the institution."[10] *Id.* at 225 (additional quotation marks omitted). The Supreme Court explained that "[a]lthough the . . . facility, if it were viewed in isolation or as a separate institution, might not on its own qualify as a purely public charity, its role in the comprehensive care scheme provided by [the organization] is consistent with, is tied to, and advances [the organization's] charitable purpose." *Id.* (noting that the "facility is not a public restaurant, movie theater, golf course or some other unrelated business entity existing solely as a revenue stream to finance a different and charitable endeavor"). Thus, because the facility was used as part of the charitable purpose of the institution, it qualified for a real estate tax exemption. *See id.* at 226-27.

Here, The Salvation Army is undisputedly an institution of purely public charity; the trial court so found in *Salvation Army I*, and the Board does not argue otherwise. Under the analysis mandated by our Supreme Court in *Alliance Home*, The Salvation Army was not required to prove each element of the *HUP*/Act

---

[10] This reasoning is consistent with the language of Section 8812(a)(3)(ii) of the current Consolidated County Assessment Law, which, like Section 202(a)(3) of the former Fourth to Eighth Class County Assessment Law cited *supra* at note 3, provides for exemption from real estate tax for property of institutions of purely public charity where "[t]he property of purely public charities is necessary to and actually used for the principal purposes of the institution . . . ." 53 Pa.C.S. § 8812(a)(3)(ii).

11

55 framework[11] for each tax parcel in order to qualify for tax exemptions for all of the tracts.[12] Thus, we do not consider whether each separate tax parcel, viewed in isolation, qualifies as an institution of purely public charity. *See Alliance Home*, 919 A.2d at 225. Instead, the dispositive question here, as in *Alliance Home*, is whether the tax parcels at issue are actually and regularly used for The Salvation Army's purposes or to advance its charitable purpose. *See id.* Stated otherwise, the question is whether each tax parcel's "role in the comprehensive . . . scheme provided by [The Salvation Army] is consistent with, is tied to, and advances [The Salvation Army's] charitable purpose." *Id.* Where "[t]he facts respecting the use that is made of the property are not in dispute . . . , the question is resolvable as a matter of law." *Id.*

In its brief, The Salvation Army explains, with citations to evidence from the reproduced record (R.), that among its organizational purposes are "the preaching of the Gospel and dissemination of Christian truth by means of open-air and indoor meetings." Salvation Army Br. at 11 (citing R. 67a). Further, The Salvation Army points to record evidence that it

---

[11] We note, however, that if analysis of those factors were required, the only one not conceded by the Board was whether The Salvation Army's use of the tracts at issue relieved the government of some of its burden. In that regard, our Supreme Court observed, "we recognize the important public role served by institutions of purely public charity, that their very mission serves to relieve government of some of its burden . . . ." *Alliance Home*, 919 A.2d at 227. More specifically, as stated above, the trial court found in the 1993 litigation that The Salvation Army's activities relieve the government of some of its burden. *Salvation Army I* at 9.

[12] *Goodwill Industries of North Central Pennsylvania, Inc. v. Centre County Board of Assessment Appeals*, 323 A.3d 887 (Pa. Cmwlth. 2024), on which the Board relies, does not support the Board's position. There, the parties stipulated that Goodwill met all of the *HUP* factors for an institution of purely public charity. *Id.* at 893. The issue was whether a specific Goodwill store impermissibly operated in competition with local commercial enterprises. *See id.* at 894-95 (quoting 53 Pa.C.S. § 8812(a)(3)(ii) (providing that a property of a private charity is exempt from taxation if, *inter alia*, that property is "not used in such a manner as to compete with commercial enterprise")). Thus, *Goodwill* presented a separate tax exemption issue not implicated here. Moreover, we observe that this Court affirmed the tax exemption at issue in *Goodwill*. *Id.* at 896.

has long been recognized as a purely public charity in Pennsylvania and that it uses the entire 1,200 square acres of the Ladore Property in furtherance of its exempt purpose. The record at the trial court . . . documents at great length how [The Salvation Army] uses the Ladore Property in furtherance of that work. The Salvation Army provides a range of public services, including disaster relief and emergency shelters; shelter to people experiencing homelessness; food pantries; free groceries; thrift stores and donation services for food, clothing, and goods; rent assistance; holiday giving programs; after-school programs and summer camps; youth mentoring; adult programs for recovery, job training, and housing assistance, including for people with mental health or substance abuse issues; veteran's services; and spiritual worship services to those seeking renewed hope through spiritual healing. (R. 99a, 139a). It is undisputed in this appeal that [The Salvation Army] uses the Ladore Property in part to provide youth camps to children from underprivileged backgrounds, regardless of their financial means, to help them learn new skills and experience the outdoors, sometimes for the first time. (R. 144a-46a). The hearing testimony at the trial court established that [The Salvation Army] also uses the Ladore Property to provide retreats and services to seniors and to adults recovering from substance abuse in conjunction with its adult rehabilitation centers, to provide hunting grounds and community events for veterans, and to train its own staff to provide all of the services provided by [The Salvation Army], as discussed at length at the trial court hearing. (R. 143a-47a (seniors); R. 149a-51a (rehabilitation); R. 153a-54a (veterans); R. 167a-70a (veterans); R. 148a (staff training)). The testimony at the trial court hearing established that, underlying all of [The Salvation Army's] work is the belief that there is divinity in nature, that connecting individuals to nature is key to their spiritual healing and physical and emotional wellbeing, and that the Ladore Property was chosen for this purpose, and has been maintained and used by [The Salvation Army] in furtherance of that goal to accomplish its charitable mission. (R. 213a-15a).

Salvation Army Br. at 8-9 (record cites cleaned up). With specific reference to the

Camp Ladore Retreat and Conference property, The Salvation Army observes,

> [t]he record is replete with evidence that [The Salvation Army] . . . holds "older adult services . . . as well as youth education and recreation as well as . . . adult rehab services" on the Ladore Property. (R. 143a). Major Tawny Cowen Zanders, the general secretary of the Eastern Pennsylvania and Delaware Division of [The Salvation Army], testified that [The Salvation Army] runs adult rehab centers (ARCs) that provide to individuals struggling with addictions the emotional, spiritual, and social care to assist them in their recovery, and it hosts retreats for free at the Ladore Property for such individuals to assist them in their recovery multiple times per year. (R. 143a-44a; R. 150a-51a). [The Salvation Army] hosts an annual ARC Memorial Day picnic and an annual ARC Labor Day picnic, using Oneida field at the Ladore Property and which "make use of ***all of the . . . property***." (R. 158a-59a). [The Salvation Army] also hosts the PennDel ARC retreat, which typically serves approximately 130 individuals and make[s] use of the Ladore Lodge, worship areas and provides to the participants "***access to the whole property***." (R. 159a).
>
> [The Salvation Army] provides retreats for senior citizens to provide them a space for community engagement, th[r]ough which "***they can access anything . . . at Ladore whether it[']s . . . hiking . . . the ropes course . . . swimming and fellowship together and [sic] just walking around the property***." (R. 146a, 147a-48a). [The Salvation Army] provides discounted camps for individuals age 50 and up - typically at the rate of $300 for a week stay – that include property tour wagon rides, hiking, archery, swimming, and a 250-foot zipline. (R. 177a-80a).
>
> [The Salvation Army] uses the Ladore Property to provide numerous services to veterans. [The Salvation Army] recently began a partnership with Camp Freedom, a non-profit corporation that provides outdoor adventures for disabled veterans and First Responders, their family members, and Gold Star Families[], to give them free

14

access to the Ladore Property for archery hunting purposes. (R. 153a-54a, 168a-69a). Mark Scott, the Complex Operations Manager at Camp Ladore, testified that Camp Freedom hunters utilize a portion of the Eastern portion of the Ladore Property. (R. 169a-70a). This is a portion of the Ladore Property that is on the opposite side of Lake Ladore from where most of its trails and improvements are located. The development of this partnership is exemplary of [The Salvation Army's] dedication to utilizing its property to support the veteran community. [The Salvation Army] hosts at least one annual free fishing event for veterans each year, and it hosts a free, public annual event to honor veterans that includes free lunch, pontoon rides on the lake, wagon rides to the pontoon, and visitors "can walk around the [] main lodge and use the amenities there [] while they're in that day." (R. 166a-68a).

In addition, [The Salvation Army] uses the Ladore Property to conduct trainings for its own staff and advisory board, to prepare them to provide [The Salvation Army's] services in furtherance of its charitable mission in the respective communities that they serve. (R. 148a).

*Id.* at 21-23 (emphasis added; records cites cleaned up; footnotes omitted).

Thus, the evidence facially supports The Salvation Army's position that it uses the entire property to support its charitable mission. The Board does not dispute that evidence; nor does the Board dispute that the uses of the tax parcels at issue are consistent with, are tied to, and advance The Salvation Army's charitable purposes. To the contrary, the Board expressly acknowledges that The Salvation Army is advancing its charitable purpose with regard to the tax parcels at issue. *See* Bd. Br. at 2. Rather, the Board disputes specifically and solely whether The Salvation Army established that the use of each tax parcel relieves the government of some of its burden. As fully discussed above, however, that question is not properly part of the applicable analysis here. Because the Board does not dispute The Salvation Army's evidence of the uses it makes of the entire property, and

15

because those uses facially advance The Salvation Army's charitable purposes, the trial court erred in denying tax exempt status for the entire property.

## IV. Conclusion

Based on the foregoing discussion, we conclude that the trial court made an error of law by applying the *HUP*/Act 55 factors to separate tax parcels and by failing to conclude that, because the property as a whole is undisputedly used in furtherance of The Salvation Army's charitable purposes, The Salvation Army is entitled to exemption from real estate taxes on the entire property. Accordingly, we reverse the trial court's order.

 

_____

CHRISTINE FIZZANO CANNON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Salvation Army,                                 :
                          Appellant                 :
                                                    :
            v.                                      :
                                                    :
Wayne County Commissioners,                         :
Sitting as Wayne County Board of                    :
the Assessment and Revision of                      :     No. 730 C.D. 2025
Taxes                                               :

## **O R D E R**

AND NOW, this 28th day of July, 2026, the May 9, 2025 order of the Court of Common Pleas of Wayne County is REVERSED.

---

CHRISTINE FIZZANO CANNON, Judge